Bouldin, J.,
delivered the opinion of the court.
The plaintiff in error was indicted at the March term of the Hustings court of the city of Richmond for forging a public record, then being in the office of the second auditor of this state. On his arraignment he demurred to the indictment; but his demurrer was overruled by the court, and he was put on his trial, was found guilty by the jury, and his term of imprisonment in the penitentiary was fixed at four years. In the progress of the trial sundry bills of exception were taken by the accused to rulings of the court, and the bills were signed and sealed by the court, and made a part of the record. After the verdict of the jury was rendered, the accused moved the court to set the same aside as contrary to the law and the evidence, and also moved in arrest of judgment; both of which motions were overruled by the court without exception, and judgment was entered according to the verdict. On a subsequent day the accused moved the court to set the judgment and verdict aside, and award him a *874 new trial, on the ground that Joseph Mayo, Jr., a material witness for the commonwealth to prove the alleged forgery was then insane; that he was insane at the time he testified, and had been insane for some time prior to the trial. Affidavits of the prisoner and of one of his counsel were filed, showing that they had no suspicion of the insanity of the witness during the trial, but had ascertained the fact after the case was ended. Much testimony was taken on the motion on both sides, but after fully considering the same, the motion was overruled by the court, and the prisoner again excepted. The testimony offered on this motion, and the reasons of the court for overruling it, are fully set forth in the bill of exceptions.
A writ of error was awarded by this court to the judgment of the Hustings court, on which the case is now before us.
We shall consider the errors relied on in the order-in which they have been presented at the bar. The first error assigned is the refusal of the court to set aside the judgment and verdict on account of the alleged insanity of the witness, Joseph Mayo, Jr.
There can be no doubt, that the rule laid down by Peake in his work on Evidence, and approved by the Court of Errors of New York in the case of Hartford v. Palmer, 16 John. R. 143, is sound and reasonable, and is one, as said by the court in that case, “which cannot fail to command the respect of all mankind;” to wit, “that all persons who are examined as witnesses must be fully possessed of their understanding; that is, such understanding as enables them to retain in memory the events of which they have been witnesses, and gives them a knowledge of right and wrong; that, therefore, idiots and lunatics, whilst under the influence of their malady, not possessing their share of understanding, are excluded.”
*875 It will be seen then, that a witness is not excluded by this rule, merely because be is a lunatic. That is not enough per se to exclude him; but he must at the time of his examination be so under the influence of his malady as to be depi’ived of that “share of understanding” which is necessary to enable him to retain in memory the events of which he has been witness, and gives him a knowledge of right and wrong.” If at the time of his examination he has this share of understanding, he is competent. That is the test of competency, and of such competency the court is the judge; whilst the weight of testimony—the credit to be attached to it—is left to the jury.
Mr. Wharton, in his work on Criminal Law, says, “ It was once held that an idiot was inadmissible, and so of a lunatic. It is now settled, however, that iu all cases, either an idiot or lunatic may be received, if, in the discretion of the court, he appears to have sufficient understanding to apprehend the obligation of an oath, and to be able to give a correct answer to the questions put. The competency is to he determined by the judge trying the case, upon the examination of the witness himself, or upon the testimony of third persons.” 1 Wharton’s Crim. Law, § 752, and cases cited.
In the case of the Queen v. Hill, 20 Law Journal, N. S., p. 22, (reported also in 5 Eng. Law & Eq. E. 547} it was held by all the judges, Ld. Campbell, C. J., presiding, that the mere fact of insanity is not enough per se to exclude a witness. The judges were all of opinion, that if at the time of his examination, he appeared to the judge to be of sufficient intelligence to distinguish between right and wrong—to appreciate the nature and obligation of an oath—then he was admissible; all beyond was matter affecting the weight of *876 '*:es6mony and his credit as a witness, and was therefore matter for the consideration of the jury. “If,” as Coleridge, J. says, ibid. p. 26, “his evidence had in the course of the trial, been so tainted with insanity as to be unworthy of credit, it was the proper function of the jury to disregard it, and not to act upon it.”
¥e think the principle of law in such cases, as above laid down, furnishes a sound and reasonable rule. The question then before this court is not whether the witness, Joseph Mayo, Jr., was or was not a lunatic; whether on two occasions, shortly before his examination, he was not for a few days decidedly insane; whether a few days after his examination he was not in the same condition; or whether at the time of the motion he was not, and is not still, a lunatic; all of which we incline to believe has been established by the proofs and admissions of counsel, before this court in argument. This we say however is not the question before this court; for, as was said by Judge Story, speaking for all the judges of the United States Supreme court in the case of Evans v. Hettick, 5 Wheat. R. 470, “a person being subject to fits of derangement is no objection either to his competency or credibility if he is sane at the time of his giving his testimony.” The real question before us is, whether on Monday and Tuesday, the 28d and 24th of March 1874, when, as a witness in.this cause, he was subjected to a protracted and searching examination and cross-examination, without objection to his competency from any quarter, Joseph Mayo, Jr., possessed a sufficient share of understanding to appreciate the nature and obligation of an oath; to distinguish between right and wrong; to remember events, of which he had been a witness; and to answer intelligently the questions propounded to him. If he then possessed that degree of *877 intelligence, we think he was competent. The learned judge who presided at the trial, and whose peculiar province it was to decide that question, was of opinion that he did possess the requisite share of understanding; and it would require very cogent and conclusive proof to the contrary to induce this court to interpose under such circumstances. But we see no error in the ruling of Judge Guigon on the motion. With all the testimony before us, we fully concur with him in the opinion that there was nothing in the testimony to justify the exclusion of the witness, even had the motion been made before his examination. But there was no such motion; and in deciding this question we have the benefit of an actual examination of Col. Mayo as a witness on two successive days—the whole examination relating to complicated transactions of a delicate and painful character; yet during that protracted examination nothing occurred which excited even a suspicion of insanity in the mind of the plaintiff' in error, or of his learned and astute counsel; although they did think that he was under the influence of stimulants; nor upon a close and critical review of his-testimony, since it was given, have they been able to point the court to anything in it evincing delusion or inconsistency, any want of intelligence, or even want of memory. Whilst on the other hand Judge Guigon certifies, that although evidently drinking deeply, he was at the time of his examination “ a competent and proper witness, and not laboring under any mental disability whatever;” that his mind was perfectly clear, his appreciation of the interrogatories perfect, his answers clear and intelligent, and framed in language unusually accurate and succinct, giving a better and clearer idea of the complicated transactions as to which he deposed than any other witness in the case.” The *878 tes'fcimony °f the commonwealth’s attorney, and of the five jurors, who, among others, were examined, was substantially to the same effect. This testimony all applied to Mayo’s state of mind on the two days on which he was examined as a witness, being the precise time at. which, in the opinion of this court, it was material to ascertain the state of his mind; and there is, in our opinion, nothing in the record to counteract it, or to weaken its force. We are of opinion therefore that the motion was properly overruled.
The next error assigned is, that the court erred in overruling the demurrer to the indictment; that it was not sufficient to charge that the defendant forged a public record, describing it so as plainly to identify the record charged to have been forged; but that it was further incumbent on the commonwealth to state all the facts necessary to show that the document alleged to be a public record, was in point of fact such record.
Were such strictness now required, it might well be held that it is met by the terms of the indictment. The document forged is charged to be a public record remaining in a public-office, the office of the second auditor, judicially known to be a public officer; the record being the warrant book of the sinking fund, a fund judicially known to be a public fund, the sole property of the state; the entry on that book alleged to have been forged, being’ set out totidem verbis, and showing on its face that it is an entry of a public nature, and affecting the public interest. Did the law now require the strictness of allegation contended for by the counsel for the plaintiff in error, we should be •strongly inclined to hold that his demands were fully met by the terms of the indictment. But the minuteness and particularity formerly required in indictments *879 for forgery are now dispensed with by express statute. All that is now required is, that the document alleged to have been forged shall be described “ in such manner as would sustain an indictment for stealing such instrument or other thing, supposing it to be the subject of larceny;” and we think there cannot be a doubt that the description given in this indictment 'of' the public record alleged to have been forged, would be amply sufficient to identify the same in an indictment for the larceny thereof.
The demurrer was, therefore, properly overruled.
3. The next objection is to the refusal of the court ■to arrest the argument before the jury until the counsel of the plaintiff in error should prepare their bill of exceptions in relation to the instructions given and refused by the court.
¥e see no error in this proceeding. It was apparent that the preparation of the bill would consume much time; and as the trial had already been a protracted one, it was deemed best by the court to consider the points as saved, to go on with the case before the jury; and when the argument should be concluded, to prepare the bill of exceptions with due care and deliberation. The question thus presented is one of practice merely, and must of necessity be left largely to the discretion of the court of trial, to be exercised according to the circumstances of the particular case. In the present case we do not see that this discretion was erroneously exercised. The length of time actually consumed in the preparation of the bill shows, we think, the propriety of the course pursued by the court. The practice itself is a very common one in such cases, and we think is commended by convenience. Ho wrong or inconvenience to the plaintiff in error has been shown to have resulted from it; and *880 whilst no unbending rule is intended to be laid down, nor can with propriety be laid down, in such cases, we are all Of opinion that in this case there was no error in the proceeding.
The next error assigned is that the Hustings court erred in giving, modifying and refusing the instructions to the jury, as set forth in the first bill of exceptions.
The instructions are all connected with and run into each other, and we will consider them as a whole.
They declare in what consists the forgery of a public record; that the warrant book of the sinking fund is such public record; and that it is of itself evidence of what it contains, to be considered with the other evidence in the case.
These are the material propositions affifmed’in the instructions given by the court. Several instructions relating to the powers and duties of the second auditor and his relation to the existing sinking fund were asked for and refused, as shown by the exception. The principal involved in this refusal, however, is so connected with the main propositions of law announced by the court, that we propose to consider them, as they have been considered at the bar, very much together.
The chief objection, to the instructions is that they affirm that the warrant book of the sinking fund is a public record, the subject of forgery as such; and is evidence per se of what it contains.
The counsel for the plaintiff in error insist, on the other hand, that it is not such a record; is not the subject of forgery as such; and is not per se evidence of what it contains, and it was error therefore so to declare.
They do not deny that a public record is the subject of forgery under the terms of our statute.
*881 What then is a public record?
Mr. Bouvier, tells us in his Law Dictionary, 2 vol., p. 429, that it is “a written memorial made by a public officer authorized by law to perform that function, and intended to serve as evidence of something written, said or done.” It must be “a written memorial,” must be made by “a public officer,” and that officer must be “authorized by law” (not required) to make it. These elements must, at the least, combine, to make the record a public record. Do they exist in this case? Before proceeding to answer that question, it may be well to consider a little further the nature of a public record, and the power of a public officer to make it. He must have authority to make it; but that authority need not be derived from express statutory enactment. Whenever a written record of the transactions of a public officer in his office, is a convenient and appropriate mode of discharging the duties of his office, it is not only his right but his duty to keep that memorial, whether expressly required so to do or not; and when kept it becomes a public document—a public record belonging to the office and not the officer; is the property of the state and not of the citizen, and is in no sense a private memorandum.
Among the writings classed by Mr. Greenleaf as public writings, and evidence per se, are “books kept by persons in public office, in which they are required, whether by statute, or the nature of their office, to write down particular transactions occurring in the course of their public duties and under their personal observation.” 1 Greenleaf’s Ev., § 483. And at page 610, § 496, the same author says: “To entitle a book to the character of an official register, it is not necessary that it- be required by an express statute to be kept, nor that the nature of the office should render the *882 book indispensable. It is sufficient that it be directed by the proper authority to be kept, and that it be kept according to such directions.” All such books are recognized as public records, not merely because they are required by law to be kept, but “ because the entries in them are of public interest and notoriety, and because they are made under the sanction of an oath of office, or at least under that of official duty.” 1 Greenleaf, § 484. And in the same section the author’ cites, as books of this description, the following among others: “the books of the Bank of England, which contain the transfers of public stock, the transfer books of the East India Company, the books of the post office and custom house, and registers of other public offices.”
With these principles in view, let us enquire what is the character of the warrant book of the sinking fund and of the entries made therein.
The book itself has been inspected by the court. It is marked on the back, where the name of a book is usually printed, “ Sinking fund.” On the outside of the first lid it is marked “Warrant book, Sinking Fund,” and at the head of the first page is written, “Sinking Fund.” The sinking fund is judicially known to the court, as we have already seen, to be a public fund owned wholly by the state, and managed wholly by public officers of the state; and the marks aforesaid upon the book in question would, if standing alone, tend strongly to show its public character. It was kept in the office of the second auditor, one of the most important public offices in the state, and one of the managers of the fund, by a clerk in that office, and by the direction of the second auditor himself. The entries, on their face, show the character of the book. They are headed “ Sinking Fund;” and on one *883 page the fund is debited with moneys received into the treasury for the fund, and on the other is credited by the warrants of the second auditor on the treasurer for amounts paid for state bonds purchased for the sinking fund. These warrants were issued as follows: an order purporting to be issued by the board of commissioners of the sinking fund, authorizing and requesting the second auditor to issue his warrant on the treasury, payable out of the sinking fund, for a given sum, the purchase money of a certain amount of state bonds, certified and signed by the plaintiff in error, as secretary of the board, would be carried to the clerk in the second auditor’s office who kept the warrant book aforesaid. This clerk would then make the entry in the warrant book, and file away the order, fill a warrant on the treasurer in the name and in favor of the seller of the bonds, for the amount of the purchase money, which would be signed by the second auditor; and on the back of this warrant the treasurer drew his check on a bank for the amount. The entries of the transaction on the warrant book showed the number of the warrant, the person or persons in whose favor it was drawn, the face value of the bonds for the purchase of which it was payment, and the exact amount paid; and the second auditor proves that he kept that book as a record of the amount of bonds purchased by the sinking fund, and as a record of the receipts and disbursements of his office as to the sinking fund, as required by § 22 óf ch. 42, Code of 1873. If a record thus kept by such public officers, and relating to matters of such grave public interest, be not a public record, then it is difficult to conceive what ■does or can constitute a public record. But it is argued that the section to which the second auditor referred as his authority to keep this record, is repealed, *884 and that he has no authority whatever in the premises; therefore the record kept is not a public record.
W ere the repeal conceded, we are by no means prepared to concede that the supposed result would follow. There can be no doubt that the second auditor under the general law, is bound to keep a record of the public transactions of his office; and it is clear, whether under a mistaken sense of public duty or not, that the transactions recorded in the warrant book aforesaid didin fact take place in his office; that it was to the interest of the public that they should be recorded; that they were in fact recorded, and as a necessary consequence the record was public. The state had a right to the record, and this was the only one kept.
But the court is of opinion that the section aforesaid is not repealed, and the auditor was, in the strict line of official duty, both in acting as he did and in recording his acts.
It .is not pretended that the section referred to is anywhere repealed by express enactment. If then it be repealed at all, it must be by implication merely, by the passage of some act covering the same ground and in conflict witli it. ilo such act has been pointed out, nor can be, for none such exists. It is true that the act of March 30th, 1871, known as the funding act, created a new sinking fund in conflict with that formerly existing, and thereby by implication repealed the same, and that a different board of commissioners, was established to manage it, but the number and name of the board was the same in both cases, and the second auditor was a member of both boards. There was no change whatever made in the details of management, no new or different system provided, and it is but reasonable to suppose, as indeed is the conclu *885 sion of law, that it was the wish and design of the legislature to preserve the then existing system, so far as applicable to the subject. And we are fortified in view by the fact, known to us judicially, that the second auditor, who, as we have seen, was a member of both boards, has, since the creation of the new sinking fund, continued to keep in his office the record of his transactions, in relation to the sinking fund, under the 22d section of eh. 42, Code of 1873, precisely as he did before the new sinking fund was established, and has annually reported the same to the legislature as a portion of the transactions of his office, without any intimation to him on the part of that body that he was usurping authority, or any amendment or repeal of the law under which he was acting.
We are of opinion therefore that the twenty-second section of chapter 42 of the Code of 1873, is not repealed, but is still in force; and that the same was properly referred to by the second auditor as an authority for his action in relation to the sinking fund. That section not only authorizes but requires the second auditor to keep an account of the transactions of the sinking fund with the treasury, and also to report the same to each session of the legislature.” The warrant book aforesaid of the sinking fund is the only record kept of those transactions, and we are therefore further of opinion, as we have already said, that the book thus kept is a public record, is evidence per se of what it contains, and that there was no error in giving and refusing the instructions as set forth in the first bill of exceptions.
This disposes of the point saved in the third bill of exceptions also. The counsel for the accused was arguing to the jury on a mistaken view of the meaning of the addition made by the court to the fourth in *886 struction. The court referring to the warrant book aforesaid, added to the fourth instruction as follows: But such book is of itself evidence to be considered by the jury in connection with other evidence.” The counsel was contending that the court meant to say that the book was before the jury like a letter, to be-referred to by witnesses to refresh their memory, but that, standing alone, it was not evidence to prove the number of bonds for which warrants had issued. The court interrupted the counsel and said to the jury that the warrant book was not like a letter, to be referred to only to refresh the memory of witnesses; but was-admitted as evidence per se of that which it contains; and to this opinion the accused excepted. We have already seen that the warrant book, in the opinion of" this court, is a public record, and evidence of itself of' what it contains; that the instruction as given was proper; and, of course, there was no error in correcting the counsel.
We have thus noticed and disposed of all the errors relied on by counsel, and are of opinion that there is-no error in the record. The judgment of the Hustings court must therefore be affirmed.
Judgment aeeirmed.