STATE OF MINNESOTA v. HARRY T. HAYWARD.[1]

Nov. 20, 1895.

Nos. 9592—(99).

**Murder—Admission of Independent Crimes.**

On the trial of an indictment for one crime, the prosecution may prove the admission by the defendant of the commission by him of other, independent, crimes, when relevant and material to the issue.

**Same—Prior Conversations—Admissions of Intention.**

Conversations of the defendant four or five months before the commission of the murder *held* competent, under the circumstances, as tending to prove that he then contemplated the commission of the crime.

[1] Reported in 65 N. W. 63.

### Same—Prior Statement of Deceased.

The statement of the deceased a few hours before the homicide, not in the presence of the defendant, that she had a business engagement with him that evening, *held* competent evidence against him, in connection with the other evidence in the case.

### Expert Evidence.

Certain expert evidence *held* to be irrelevant.

### Corroborative Evidence.

Certain evidence offered to corroborate the defendant's evidence *held* of no weight, and that it was not error to rule it out.

### Cross-Examination.

Two witnesses for the defense testified that in the company of each other they were going along the road, when they observed certain facts. *Held*, it was not error to permit them to be cross-examined for the purpose of ascertaining whether there was any concert or agreement between them as to their testimony, and for this purpose the court might permit one witness to be asked what the other witness had subsequently told him as to what he saw.

### Corroborative Evidence.

Certain evidence offered to corroborate one of the state's witnesses *held* properly admitted.

### Cross-Examination.

After a witness had been fully cross-examined on a certain point, *held* not error to refuse to permit him to be further cross-examined on the same point later in the trial.

### Evidence out of Order.

*Held* not error to refuse to receive certain evidence at the close of a protracted trial, after the regular time to introduce it had passed. *Held*, also, that the rulings of the trial judge do not show that he exercised his discretion in favor of so receiving the evidence out of order, but rejected it on some other ground.

### Insanity of Witness—Remarks of Judge.

After a witness for the state had testified at considerable length, and was to all appearances perfectly sane and rational, the defense objected to his competency on the ground that he was insane, but made no offer to prove that he was. *Held*, under the circumstances, it was not error for the judge to assert that he did not see that the witness was at that time any more insane than the attorney was.

### Temporary Insanity—Presumption of Continuance.

When insanity of a permanent type is once shown, it is presumed to continue until it appears that the person has again become sane. But this

presumption only applies to habitual insanity, which has continued so long as to raise a presumption that it is permanent. Temporary insanity, or temporary delusions or aberrations, are not presumed to continue, and evidence of the same, standing alone, is no evidence that the person is insane at a later period.

## Insanity of Ancestor.

Evidence of the insanity of a person's ancestors and relatives is not alone competent or sufficient to prove that he is insane, and such evidence can only be used to corroborate other evidence of his insanity.

## Evidence of Insanity—Collateral Issue.

Whether, when insanity is a direct issue in the case, evidence of prior temporary delusions or mental aberrations, and evidence of insanity of ancestors and relatives, are together sufficient, without more, to go to the jury as evidence of the person's insanity at a later period, quære. But held, such evidence, without more, is not sufficient to go to the jury when insanity is merely a collateral issue, as where an attempt is made to impeach the competency or credibility of a witness by proving that he is insane. Distinction between insanity as a direct issue and as a collateral issue noted. When an attempt is thus made to impeach the credibility of a witness, the court may in its discretion refuse to receive evidence of insanity of his ancestors and relatives, and evidence of his prior temporary delusions and aberrations, until some other evidence is first given of his insanity at the time of the transactions testified to, or at the time of trial.

Appeal by defendant from an order of the district court for Hennepin county, Smith, J., denying a motion for a new trial, after conviction of murder in the first degree. Affirmed.

*W. W. Erwin* and *Walter A. Shumaker*, for appellant.

Proof of the commission of an independent crime by defendant cannot be introduced to connect him with the crime charged. Hoberg v. State, 3 Minn. 181, (262); Shaffner v. Com., 72 Pa. St. 60; State v. Lapage, 57 N. H. 245; People v. Corbin, 56 N. Y. 363; Coleman v. People, 55 N. Y. 81; Snyder v. Com., 85 Pa. St. 519; Barton v. State, 18 Oh. 221; Coble v. State, 31 Oh. St. 100; Garrison v. People, 87 Ill. 96; People v. Barnes, 48 Cal. 551; People v. Sharp, 107 N. Y. 427, 14 N. E. 319. While evidence, if relevant to the issue, is not to be excluded simply because it tends to prove the commission of another crime (State v. Madigan, 57 Minn. 425, 59 N. W. 490), the fact of the

commission of other crimes by defendant in the East in no way tended to prove the charge in the indictment. Shaffner v. Com., supra. The recognized exception to the rule excluding proof of independent crime may be stated as follows: (1) Where the crime charged is one of a series or system of interdependent crimes, the entire system may be disclosed by the evidence. Cole v. Com., 5 Gratt. 696; State v. Miller, 47 Wis. 530, 3 N. W. 31; Com. v. Call, 21 Pick. 515; Com. v. Miller, 3 Cush. 243. (2) When criminal intent or guilty knowledge in respect to the act charged is an element of the offense, evidence of other acts of the accused manifesting that intent or knowledge is competent, notwithstanding that it may establish the commission of an offense not charged. Com. v. Nichols, 114 Mass. 285; Reg. v. Cotton, 12 Cox, Cr. Cas. 400; Dobson v. State, 5 Lea, 271. This rule applies only when act and intent are severable,—not to establish the act of crime, but to prove an intent not inferable from the act. Mayer v. People, 80 N. Y. 364; State v. Shuford, 69 N. C. 486, S. C. 1 Green Cr. L. Rep. 247; Snapp v. Com., 82 Ky. 173. (3) Sexual crimes form a special exception, which stands upon the reason that the fact of illicit sexual relations being once established makes an attempt at their resumption more probable. State v. Williams, 76 Me. 480; State v. Markins, 95 Ind. 464; People v. Jenness, 5 Mich. 305; State v. Lapage, supra. (4) When an extraneous crime forms part of the res gestæ, evidence of it is not excluded by the fact that it is extraneous. Com. v. Sturtivant, 117 Mass. 122. The evidence here falls under none of the exceptions. Propensity to commit crime cannot be proved. State v. Renton, 15 N. H. 169; 1 Phillips, Ev. 181. In Tennessee it has been directly held that evidence of admissions to an accomplice of the commission of former crimes, though part of a conversation in regard to a particular crime, is inadmissible. Kinchelow v. State, 5 Humph. 9. The evidence was prejudicial if irrelevent. Hoberg v. State, supra.

The court erred in admitting the testimony of Vallely. The only hypothesis on which it could be received is that it refers to the commission of the crime charged. People v. Sharp, supra; Com. v. Jackson, 132 Mass. 16. It does not tend to prove the crime. The court erred in admitting the testimony of Mrs. Hazleton. It was not part of the res gestæ. Conlan v. Grace, 36 Minn. 276, 30 N. W. 880;

Lund v. Tyngsborough, 9 Cush. 36; 20 Cent. Law J. 453, note; People v. Ah Lee, 60 Cal. 85, State v. Davidson, 30 Vt. 377; Hanover R. Co. v. Coyle, 55 Pa. 396; Com. v. Hackett, 2 Allen, 136; Reg. v. Wainright, 13 Cox, Cr. Cas. 171, 14 Moak, Eng. Rep. 623; Reg. v. Pook, 13 Cox, Cr. Cas. 172m, 14 Moak, Eng. Rep. 625n. See, also, Reg. v. Bedingfield, 14 Cox, Cr. Cas. 341; State v. Dula, 1 Phil. (N. Car.) 437; State v. Ching Ling, 16 Ore. 419, 18 Pac. 844; Cheek v. State, 35 Ind. 492; People v. Carkhuff, 24 Cal. 640; People v. Williams, 3 Park. Cr. Cas. 84; Kirby v. State, 9 Yerg. 383; State v. Vincent, 24 Iowa, 570; State v. McCracken, 66 Iowa, 569, 24 N. W. 43; Montag v. People, 141 Ill. 75, 30 N. E. 337; Crookham v. State, 5 W. Va. 510; Wood v. State, 92 Ind. 269; Trimmer v. Trimmer, 13 Hun, 182. The testimony of defendant's witness as to the finding of the bottle should have been received. It was for the jury to determine the effect of the lapse of time on the credibility of the evidence. Ettinger v. Com., 98 Pa. St. 338. The testimony of Woods was improper. A witness cannot be impeached by showing that he has not told his story out of court, unless there be peculiar circumstances calling upon him to speak. Com. v. Hawkins, 3 Gray, 463; Huebner v. Roosevelt, 7 Daly, 111. It was immaterial whether Stevens had told Woods he could describe the man, and an immaterial matter having been drawn out on cross-examination the witness cannot be impeached upon it. Derby v. Gallup, 5 Minn. 85, (119); State v. Staley, 14 Minn. 75, (105); Allen v. Coates, 29 Minn. 46, 11 N. W. 132; Paddock v. Kappahan, 41 Minn. 528, 43 N. W. 393. Even if Stevens had told Woods he could describe the man, the statement would have been immaterial and could not be contradicted. Haley v. State, 63 Ala. 83; People v. McKeller, 53 Cal. 65; McKeone v. People, 6 Colo. 346; State v. Cokely, 4 Iowa, 477; People v. Ware, 29 Hun, 473, S. C., 92 N. Y. 653; Rosenweig v. People, 63 Barb. 634; People v. Cox, 21 Hun, 47; State v. Elliott, 68 N. C. 124. The testimony of the wife of Adry Hayward that her husband had gone home and got his revolver was improper. A witness cannot be corroborated by a mere cumulation of evidence on an immaterial point to which he has testified. State v. Callahan 47 La. Ann. 444, 17 South. 50; McClintock v. Whittemore, 16 N. H. 268; Wiggin v. Plumer, 31 N. H. 251; Rapalje, Witnesses, § 221; Edgerton v. Wolf, 6 Gray, 453.

The court erred in its remark as to the apparent sanity of the witness Adry Hayward on objection being made to his competency. The competency of a witness is for the court, but, if he is competent, his credibility, and how far it is affected by his unsoundness of mind, is for the jury. Rivara v. Ghio, 3 E. D. Smith, 264. The objection to his competency was properly overruled. Cannady v. Lynch, 27 Minn. 435, 8 N. W. 164. But this did not affect the right of the jury to consider his mental capacity as bearing on the weight of his testimony. Rivara v. Ghio, supra; State v. Kelley, 57 N. H. 549; People v. New York Hospital, 3 Abb. N. C. 229, Note. All expression of opinion as to the credibility of a witness is error. McMinn v. Whelan, 27 Cal. 300; People v. Bonds, 1 Nev. 33; State v. Ah Tong, 7 Nev. 148; Crutchfield v. Richmond & D. R. Co., 76 N. C. 320. The testimony offered to show the insanity of Adry Hayward should have been received. Though a witness may be so far sane as to be competent, his mental unsoundness may be proved to detract from the weight and credit of his testimony. Wharton, Cr. Ev., §§ 370, 371 and cases; Rivara v. Ghio, supra; State v. Kelley, supra; People v. New York Hospital, supra, note; Livingston v. Kiersted, 10 Johns. 302. Proof that a person acted at the time to which his testimony refers in a manner showing insanity is not necessary to proof of his insanity at such time. Testimony of delusions entertained at other times was relevant to show a delusion at the time testified to. Where the question is whether a person was insane on a given day, prior and subsequent insanity may be shown. State v. Kelley, supra; State v. Felter, 25 Iowa, 67; McAllister v. State, 17 Ala. 434; Dickinson v. Barber, 9 Mass. 225; State v. West, 1 Houst. Cr. Cas. 371; Com. v. Wilson, 1 Gray, 337; Warren v. State, 9 Tex. App. 619; State v. Kring, 64 Mo. 591; State v. Spencer, 21 N. J. Law, 196; Lawson, Insan. Def. Crime, 860; State v. Hays, 22 La. Ann. 39; Vance v. Com., 2 Va. Cas. 132. Evidence of delusions other than that under which the witness is alleged to testify is competent. The tendency of the decisions is to admit the testimony of persons of unsound mind except in extreme mania, leaving its weight and credibility to the jury. Wharton, Cr. Ev. §§ 370, 371, and cases; People v. New York Hospital, supra, note. Reg. v. Hill, 2 Den. C. C. 254. All reasonable latitude should be allowed to the introduction of evidence to establish insanity. Dejarnette v. Com., 75 Va. 867.

*H. W. Childs*, Attorney General, *Frank M. Nye*, County Attorney Hennepin County, and *James A. Peterson*, Ass't. County Attorney, for the State.

The testimony of Vallely was proper to corroborate that of Adry Hayward. Evidence of threatening language indicating an intent to take life, though not referring to a particular person, is admissible. Benedict v. State, 14 Wis. 423; Campbell v. State, 23 Ala. 44; State v. Cowell, 12 Nev. 337; Bruton v. State, 21 .Tex. 337; Edmonds v. State, 34 Ark. 720, and cases there cited. The evidence would have been proper on the question of intent, even independently. Campbell v. State, supra; State v. Green, 92 N. C. 779; State v. Morton. 107 N. C. 890, 12 S. E. 112. The conversation of Mrs. Hazleton was part of the res gestæ. Wharton, Cr. Ev. § 263 and note; Hunter v. State, 40 N. J. Law, 495; State v. Dickinson, 41 Wis. 299, and cases there cited; Thomas v. State, 67 Ga. 460; Territory v. Couk, 2 Dak. 188, 47 N. W. 395; Cluverius v. Com., 81 Va. 787; State v. Cross, 68 Iowa, 180, 26 N. W. 62; Kirby v. State, 7 Yerg. 259; Edmonds v. State, supra; People v. Arnold, 15 Cal. 476; Carr v. State, 43 Ark., 99; Tilley v. Com., 89 Va. 136, 15 S. E. 526; State v. Moxley, 102 Mo. 374, 14 S. W. 969, and 15 S. W. 556; Renfro v. Com. (Ky., Ct. App.. June, 1889) 11 S. W. 815; Jordan v. State, 81 Ala. 20, 1 South. 577; State v. Howard, 32 Vt. 380; State v. Winner, 17 Kan. 298; Burns v. State, 49 Ala. 370; State v. Vincent, 24 Iowa, 570; State v. Horan, 32 Minn. 394, 20 N. W. 905; Lake Shore & M. S. R. Co. v. Herrick, 49 Oh. St. 25, 29 N. E. 1052; Small v. Williams, 89 Ga. 681, 13 S. E. 589: Texas & P. R. Co. v. Lester, 75 Tex. 56, 12 S. W. 955. The competency of a witness is for the court. If the court decides that a witness is competent, evidence to affect his credibility by reason of unsoundness of mind is inadmissible. Reg. v. Hill, 5 Cox, Cr. Cas. 259; Coleman v. Com., 25 Gratt. 865, 18 Am. Rep. 711; Goodwyn v. Goodwyn, 20 Ga. 600; Campbell v. State, supra; Bell v. Rinner, 16 Oh. St. 45; Kendall v. May, 10 Allen, 59. See Dole v. Thurlow, 12 Metc. (Mass.) 157; State v. Scanlan, 58 Mo. 204; Peterson v. State, 47 Ga. 524; Com. v. Mullins, 2 Allen, 295; Com. v. Hills, 10 Cush. 530; State v. Levy, 23 Minn. 104; Carter v. State, 63 Ala. 52; Evans v. Hettich, 7 Wheat. 453; James v. Stonebanks, 1 N. J. Law, 227; Brindle v. McIlvaine, 10 Serg. & R. 282; Campbell v. State, supra. See, also, Coleman v. Com., supra; District of Columbia v. Armes, 107 U. S. 519, 2

Sup. Ct. 840; 3 Rice, Ev. pp. 286, 287, 288; Sarbach v. Jones, 20 Kan. 497; Bucklin v. State, 20 Ohio, 18; Hoitt v. Moulton, 21 N. H. 586; Thayer v. Boyle, 30 Me. 475; King v. Wicks, 20 Ohio, 87; Bartlett v. Smith, 11 M. & W. 483. The question of competency goes to the condition of the witness at the time he testifies. Cannady v. Lynch, 27 Minn. 435, 8 N. W. 164. Even if the evidence was competent to show the condition of the witness' mind either when he testified or at a former time, it was within the discretion of the judge after hearing the witness testify to refuse evidence as to his insanity.

CANTY, J. Defendant was convicted of murder in the first degree on an indictment charging that he procured and induced one Claus Blixt to kill and murder one Catherine Ging, and aided and abetted him in so doing. From an order denying defendant's motion for a new trial, he appeals to this court, and the case comes up on a bill of exceptions.

From the evidence returned it appears that Catherine Ging was a young, unmarried woman, who carried on a dressmaking business in Minneapolis, and resided with her niece in the Ozark Flats, an apartment building in that city, owned by the father of the defendant. Defendant is a young, unmarried man. He, his father and mother, and his brother Adry Hayward, also occupied rooms or flats in that building; and Claus Blixt was the engineer who attended to the furnace and ran the heating plant in the building. On the evening of December 3, 1894, Miss Ging was found lying dead on a main-traveled road at the outskirts of the city, with a bullet hole in her head, the bullet having entered just back of the right ear. About a week prior to this the deceased made and delivered to defendant her promissory notes for $7,000, and assigned to him life insurance policies which she had, with his assistance, just procured on her own life, for the aggregate sum of $10,000. The defendant, his brother Adry, and Claus Blixt were all arrested by the authorities, on suspicion. Blixt confessed to committing the murder, and implicated the defendant.

1. On the trial Adry testified, on behalf of the state, that defendant had told him repeatedly that he was going to do away with the dressmaker, and had tried on a number of occasions to induce the witness to murder her after he (defendant) had procured insurance

v. 62 m.—31

on her life; that the witness refused to have anything to do with the scheme, tried to dissuade his brother from attempting to carry it out, and told him, "You will be haunted all your life if you do anything of the kind"; that to this the witness answered, "It is not generally known, but I have been the cause of the death of three people already." This the court, on defendant's motion, struck out, and then the witness continued: "Two in the East, and one— Of that one I don't care to speak." The court refused to strike out the last statement, and defendant excepted. Against defendant's objection and exception, the witness further testified: "He stated that he had caused a fire in the East, at a loss of half a million dollars, or rather he said about four hundred and fifty thousand. I said, 'Harry, how much did you get for it?' He said, 'Two dollars,' as if he was disgusted with it, and then said, 'There is nothing in haunting, Adry.' I referred just before that to what a terrible thing it would be,—the girl might haunt him,—and he said: 'There is nothing in haunting. People might dream certain things occasionally.' And he said, 'Besides, if you have any nerve.' I said, 'Harry, I have nerve, if you drive me to show it. I will show it in the right time, but not in killing them.'"

We are of the opinion that these exceptions are not well taken. It is true that it is error to admit evidence of other, independent crimes, unless the evidence is in some way relevant to the issue. But we are of the opinion that this evidence was relevant. The evidence tends to show that defendant was still trying to induce the witness to take part in the commission of the crime; that the witness was considerably alarmed at the risks the defendant was about to incur, and was also agitated with superstitious fear. It is fairly to be inferred that the object of defendant in making these admissions was to allay these fears, and nerve the witness up so that he would take part in the commission of the murder. These admissions are connected and material parts of the conversation between the parties.

2. One Vallely was called as a witness for the state, and permitted to testify that he was a hackman, and had been for years; that he was well acquainted with defendant, who had frequently employed him; that in July, prior to the murder, defendant, while sitting in his hack about 4 o'clock one morning, asked him some questions. Said the witness: "A. Well, he was questioning me in regard to

my conscience; if I done any deeds, or anything like that, would my conscience bother me afterwards? I told him it would. He did not mention what the deed was." "A. He asked me about driving into the lake with a party in a hack (he did not say what; he did not say who it was,—man or woman, or what), and turn off and let the team go and come out. I told him I was no swimmer." "A. He wanted to know if the team was fractious. I told him they were. Supposing they would start them and turn them loose, pull them off to the bluff,—something like that,—would it be apt to do the whole rig up? I told him it would. He asked me what I would take for the rig. I told him. He asked me if I cared what was done with the rig after he had it. I told him no, it was immaterial to me." "A. Well, he asked me some questions that I cannot just remember, in regard to having somebody in the rig and letting the team run away, or some way in that shape, if everything was fixed so nobody could find it out afterward." Defendant's objections to this testimony were overruled, and he assigns this as error.

We are of the opinion that the evidence was competent. It is true that the conversation testified to occurred some four or five months before the murder. But it appears by the evidence that intimate business and social relations existed between defendant and Miss Ging at the time of that conversation, that he then was, and for some time prior thereto had been, using her money in divers schemes and speculations, in which she was being made his dupe. Before this testimony was given Adry Hayward testified that in September, the month following the time of this conversation, defendant, while discussing ways of murdering the girl, told him of a hackman whose assistance he could obtain. Said the witness: "He said to me at different times about that time that he also proposed getting the girl out in a hack,—getting a certain hackman in town; * * * and he said this man would do anything for him. That he could get her out in that way." Under these circumstances, it was a question for the jury whether or not, at the time defendant had the conversation with Vallely, he contemplated the murder of Miss Ging, and whether his questions related thereto.

3. A Mrs. Hazleton was called as a witness on behalf of the state, and testified that she saw Miss Ging in a certain dry-goods store in Minneapolis about 4:35 p. m. the day of the murder; that they re-

mained there about 20 minutes, and left the store together about 5 o'clock; that as they were parting a few minutes later, she asked Miss Ging to go home with her to dinner, and Miss Ging answered that she could not,—that "she had a business engagement with Mr. Hayward." The witness further testified that while they were in the store Miss Ging spoke of Harry Hayward, when witness asked who he was, and Miss Ging said, "He is a friend of mine." This evidence was all admitted against defendant's objection and exception.

We are of the opinion that the evidence was competent. It appears by other evidence in the case that at 5:15 that evening deceased ordered a horse and buggy from a livery stable for her use at 7 o'clock, and at 7:08 she took the livery rig and drove it away. Blixt testified that shortly afterwards he and defendant met Miss Ging with the horse and buggy at an appointed place, several blocks away, in the direction in which she was afterwards found murdered; that at defendant's request he (Blixt) got in the buggy with the deceased, and drove her out to the place of the murder, where defendant promised her he would again meet her shortly afterwards; that this was done so as to get her to go with Blixt to the place where he was to shoot her, according to the previous arrangement between him and defendant. All of this evidence throws light on the statement of Miss Ging to the witness Mrs. Hazleton that she had a business engagement with Mr. Hayward. This statement forms a connected part of the evidence, and tends to characterize her subsequent acts and her departure on the fatal ride soon after she made the statement. This statement was not mere self-serving, hearsay evidence, but a verbal act, just as relevant as would be evidence that prior to her departure she put on her cloak or hat. Similar evidence of the declarations of the deceased prior to his departure was held competent in each of the following cases: Hunter v. State, 40 N. J. Law, 495; State v. Dickinson, 41 Wis. 299; State v. Hayden, 9 Reporter, 237, cited in Wharton, Cr. Ev. (9th Ed.) § 263, p. 196, note 3.

4. Blixt testified that the deceased was looking out of the side of the buggy when he shot her, and that immediately afterwards she threw herself back and sat still. Defendant offered to prove by two physicians that, after a person was shot as the deceased was, he would instantly become limp. The offer was refused. We are of the opinion that this ruling was not error. Even if, as stated by one of

the state's experts on cross-examination, the person so shot would instantly become limp, the evidence offered was so remote and speculative that it had no legal tendency to contradict the witness Blixt. Whether the victim fell forward or backward would depend on the inequalities in the road, and the extent of any sudden jerk or forward movement which the horse would give to the buggy on being startled by hearing the shot behind him in the buggy. After the victim had fallen backward against the back and side of the buggy seat and the buggy top, which was up at the time, she would be likely to remain there, in a sitting posture, until Blixt threw the body out, as he testified that he did.

5. Blixt testified that, prior to the commission of the homicide, defendant gave him a part of the contents of a bottle of whisky, and made him drink it, but would not give him the bottle. It is to be inferred that the whisky was given to Blixt to nerve him for the commission of the deed. The state also proved that defendant purchased such a bottle of whisky at a certain saloon in Minneapolis on the same day. Defendant, in his testimony on his own behalf, admitted that he did purchase this bottle of whisky, but denied that he gave it to Blixt, and stated that he put it in the water closet in the bath room in his mother's flat, where he believed it still was. Later in the trial the defense produced a witness by whom it offered to prove that since the aforesaid testimony was given he found a similar bottle of whisky in the place referred to. The court refused the offer, and we are of the opinion that the ruling was not error. It was more than six weeks after the time it was claimed that the bottle was put in this place until the witness claimed that he found it. There was ample opportunity in the meantime to have had the bottle refilled, and to put it, or a similar bottle of whisky, in this place. Such evidence is so easily manufactured as to have little or no weight as corroboration, and it was not error to rule it out.

6. One Woods and one Stevens were called as witnesses for the defense. They stated that in the company of each other they were going along the road together at the time. Each stated that shortly after the time of the homicide he saw the buggy returning along the road to the city. Stevens testified first, and his description of the man in the buggy did not correspond with that of Blixt. On cross-

examination he was questioned as to when he had first stated that he could describe the features of the man in the buggy; was asked if he had ever compared his recollection as to this matter with that of Woods, and if he had ever described the person in the buggy to Woods. He answered that he did not know and could not say whether he had or not. On the subsequent cross-examination of Woods he was asked if Stevens had ever claimed to be able to recollect or recognize the features of the person in the buggy, and against defendant's objection and exception the witness was allowed to answer that Stevens had not.

We are of the opinion that this was not error. It was proper to allow these witnesses to be cross-examined as to the conversations they had between themselves about this matter, and what was said, for the purpose of ascertaining how much concert of action there was between the witnesses, and how much the story of either or both had been developed, changed, or modified by such conversations or otherwise.

7. Adry Hayward testified that, in one of the conversations with the defendant in which he tried to dissuade defendant from carrying out the proposed scheme of doing away with Miss Ging, he told defendant, "If you don't get the idea out of your head, I will report you," "Harry, if you do that, you will hang"; that thereupon defendant became very angry and excited, and assaulted the witness, and threatened to do him bodily harm; that he went home from the office where they were, and got his revolver, for the purpose of having it to protect himself with it. The wife of the witness Adry was afterwards called, and testified that on this occasion he came home at an unusual hour, for him,—during the business hours of the day, —and that after he went away she discovered that he had taken his revolver with him. The evidence so given by her was proper corroboration of the witness Adry, and defendant's exception to it was not well taken.

8. On cross-examination, when recalled late in the trial, Adry Hayward was asked if he was still boarding at the expense of the state. The court sustained an objection to the question, and this is assigned as error. This was certainly proper cross-examination, and of a character which it would be error to prevent, if the witness had not already, earlier in the trial, been fully cross-examined on this

point, at which time he stated that he was in the custody or care of the sheriff, and had been since first arrested after the homicide. Under the circumstances it was to be presumed that he still continued to be in the sheriff's charge.

9. After the defendant rested, Adry Hayward was called by the state in rebuttal, and on cross-examination at that time was asked if he did not come out of the Ozark Flats at a certain time on the evening of the murder, and go off on a certain street, in a certain direction. This was apparently for the purpose of connecting him with the murder. The question was objected to on the ground that it was not proper cross-examination at that time, and the objection sustained. After the state again rested, one Kennedy was called as a witness by the defense, and asked if he did not see Adry at the time in question coming out of the Ozark Flats, and going away as above suggested. The court sustained the objections to this question, and the further offer to prove the same facts by this witness. Counsel for defendant stated that he did not offer this evidence as rebuttal, but as a part of his original case, and that he did not discover the evidence until after he had rested the original case of the defense. Thereupon the court stated that the man Kennedy had been around the court room almost every day, and refused to receive the evidence. All of these rulings are assigned as error.

Conceding that the evidence was competent if offered at the proper time, we cannot hold that it was error to refuse to receive it out of its order, at the close of a long and exhaustive trial. The witness Kennedy was the last witness called in the case, and to open up at that time a new question would tend to protract still more an already long and protracted trial. It is true that after these rulings defendant's counsel asked the judge if there was any question about the order of proof, and the judge answered "No." But the offers of proof were not renewed after this answer, and it is fairly to be inferred from the prior remarks of the judge that he did make a question about the order of proof, and the failure of the defense to offer this evidence earlier in the case. All we can hold, from the record, is that between the time of these remarks and the subsequent answer to the question of counsel the judge must have changed his mind, but we cannot tell whether he did so before or after he had made the rulings in question. Under these circumstances, we can-

not presume that by his rulings the judge intended, in his discretion, to allow this evidence to be received out of order, but rejected that evidence on some other ground.

10. After the witness Adry Hayward had testified at considerable length, and with nothing in his testimony or in the case to suggest that he was not in all respects a perfectly competent witness, defendant's attorney made the following objection, and the following proceedings took place: "Mr. Erwin: May it please the court, for the purpose of saving my rights, I want to enter an objection to the testimony of this witness, in this: that he is not competent to testify to anything in relation to this homicide against Harry Hayward, upon the ground that he labors under a delusion, and is in fact insane upon the subject. The Court: Well, I don't see that he is any more insane at the present time than the attorney is. Mr. Erwin: If your honor please, the law requires me to make an objection upon any proposition of which I expect to avail myself, and I wish to take an exception to the court's ruling at this time, and also to the court's remark before the jury." Whether the remark of the trial judge was, under the circumstances, justified, or whether it was ill advised, we need not consider. It was simply an emphatic assertion of an opinion that the witness was, from all appearances, then sane, and it was not, in any view of the matter, error.

11. The next question we will consider is the rejection by the court of offers of evidence afterwards made by defendant to prove that Adry Hayward was insane, for the purpose of impeaching his testimony.

On cross-examination the witness Adry testified concerning a dispute or a row he had with his father, mother, and brother Harry on October 7, nearly two months before the date of the murder. His statements as to what occurred at the time showed nothing unnatural or extraordinary as to him. Then the following proceedings took place: "Q. In a conversation with your mother at the Ozark in the latter part of August, do you recollect that you told your mother that your father was in the habit of going to a certain house of ill fame, and told her what the people said of him? A. I did not. Q. Did you state that you were certain of it, and did you grow violent when your statements were not believed by your mother? (Objected to as incompetent, irrelevant, and immaterial, and not cross-ex-

amination. Objection sustained.) Mr. Erwin: I want to show that he has no memory of these things. Then I will show that it took place. From that I will prove his insanity. The Court: You cannot show it now. It is not proper cross-examination. It is part of your case. The Witness: I can answer the question if you want it. The Court: Anything that pertains to any difficulty between Harry and the witness, or any fact connected with this case, material to the issue that has been called out by the prosecution, the court will allow you to examine. Mr. Erwin: None of these have been called out, because the state has been proceeding upon this proposition that this man is entirely sane. I do not claim that this man is generally insane." Thereupon a number of questions were put to the witness by defendant's attorney, and the objection to each that it is incompetent and not proper cross-examination was sustained by the court, and defendant excepted.

These questions are in substance correctly stated in the sixteenth assignment of error, as follows: (a) Whether he did not during the summer of 1894 think that his father was having him watched, and frequently accuse his father of the same. (b) Whether he (the witness) did not several times (during August, September, and October prior) say to his father that men were watching him and looking into the windows after him. (c) Whether he did not after September 27, 1894, accuse his parents of attempting to get into his room. (d) Whether he did not tell his parents that when he was on his hunting trip in September, 1894, a traveling man whom he did not know accosted him, and said, "Young man, you have had trouble, but your troubles are not over," and whether he did not say at the same time that he was so impressed by this that he returned to have his life insured. (e) Whether he did not say that he was careful not to let the man get in a position to get any advantage of him, and that no one else had noticed it, and that the man looked like a Minneapolis bum. (f) Whether he had not accused the members of his family of being in a league or conspiracy to kill him. (g) Whether he had not written to his brother Dr. Hayward that defendant and his father were in league against him, and that he had allied himself to Elder Stewart to prevent defendant getting an undue influence over his father. The last two questions referred to letters claimed to have

been written by the witness several years before, when he was in California, and it appears that the court sustained the objections to these questions because the evidence was secondary, and held that the letters should be produced. It will be observed that most of these questions relate to times long prior to the murder, and none of them relate to any time later than a month or two before the murder.

After the state rested the defendant called as a witness Mrs. L. L. Hayward (his and Adry's mother), to whom the following questions were put by defendant, objected to by the state, the objection sustained, and defendant excepted:

"Q. Has your son Adry acted in a strange, peculiar manner during his boyhood and early manhood?" "Q. Please state if there were any strange or peculiar actions in your son Adry. State them fully to the jury, giving time, place, and circumstances, and what was done for him in that regard." "Q. State, upon what you know, and what you have testified to in answer to these questions— Give your opinion whether at times your son Adry has or has not been insane, and state at what time." "Q. You state whether or not, at the time of your son's courtship with his present wife, you know anything about his strange and peculiar actions, growing out of jealousy in regard to attentions paid to her by other gentlemen suitors." "Q. Please state to the jury whether your son has been overpowered by unreasonable fears at any time, and give all the circumstances connected therewith." "Q. State what treatment was given by you or by your husband to your son Adry during the time he was afflicted with these unaccountable fears, and under whose advice—what physician's advice—you made that treatment, if any." "Q. State up to what time— What was the last time that these unaccountable fears were noticed by you in your son?"

The witness then gave her version of the dispute or row which occurred on October 7, to which we have already referred. She stated in substance that Adry was excited, and abusive to her, his father, and Harry. She was then asked how Adry looked on that occasion; what was his appearance; how were his eyes; what was his pallor; to describe him,—and whether or not, from what she testified to and what she saw of him at that time, it was her opinion that he was in-

sane. She was also asked the questions asked of Adry, and designated in said sixteenth assignment of error as questions c, d, e. Objection was sustained to each and all of these questions, and defendant excepted.

W. W. Hayward, the father of defendant and Adry, was also called as a witness for defendant, and the following proceedings took place: "Q. Now, Mr. Hayward, I will ask you to state whether there have ever been in the lifetime of Adry—from his boyhood up to the present time—any strange, peculiar actions, doings, or sayings, which led you to believe in any way that he was either generally or at times out of his mind. (Objected to as incompetent, irrelevant, and immaterial, and too broad. Objection sustained. Exception.) * * * Mr. Erwin: I offer to show by this witness that the ancestry of the witness Adry Hayward, through several generations, both collateral and direct line, were in their lifetime insane; and we further offer to prove that the conduct and manner of the said Adry Hayward, for a number of years last past, have been on many occasions both strange and unnatural; that he has on occasions, during this said time, exhibited unnatural and unfounded fear and insane delusions. This proof is offered as a part of a proposed case of the present insanity of Adry Hayward upon the subject-matter of his testimony, which is necessary to obtain the opinion of experts as to his present insanity. The Court: The objection is sustained. Mr. Erwin: Exception. * * * Mr. Erwin: Now, in this case, I have never claimed that Adry Hayward was generally insane on all subjects. That is not my proposition. My proposition is this: That Adry Hayward generally is sane on almost all subjects, but that by reason of his mental weakness or lesion, coming down to him naturally through his ancestors, matters and things brought to his mind operate differently upon his mind than they do upon ordinary sound and healthy persons. * * * Mr. Erwin: I want to correct your Honor. Your Honor thinks that I want to make the charge of general insanity. That is not true. I want to show that his ideas and his testimony upon the subject-matter of this murder of Catherine Ging are delusions and not true."

After the introduction of further testimony on behalf of defendant, he renewed several of his offers to prove that Adry was insane, and

assigned as error the following ruling of the court made thereon:
"The Court:    Objection sustained on the ground that there is no
proper foundation laid for that kind of testimony; that the order
of the testimony, as directed by the court, is to show the acts and
sayings of the witness Adry Hayward at the time which he has
testified to in this action, first, and to be proved by other proof,
if there is evidence tending to show insanity, and that the proof
must be confined to the particular delusion complained of." De-
fendant just prior to this offered in evidence certain depositions
as to the insanity of the relatives of the witness, when the court made
the following rulings:    "The Court:    I shall rule them out until you
prove by other testimony, tending to show the condition of the man,
at the time he has stated in his testimony, named in his testimony,
that the transactions took place at the time and prior and subsequent
to that time, upon that same subject.    Mr. Smith:    How long prior to
that time can we show,—during a period of years?    The Court:
That is largely in the discretion of the court.    No, sir; it would be a
short period prior to that.    The court would not exercise its discre-
tion until it had heard the testimony."

These rulings show the position the trial judge finally took as to the
character of evidence which he held necessary to impeach the witness
for insanity, and the order of its introduction which he prescribed.
All of these offers of evidence, and the judge's rulings thereon, can be
considered and disposed of together.

In all these offers of evidence, defendant did not offer to prove any
permanent or habitual insanity, or anything but temporary aberra-
tions, occurring from one month to several years prior to the time of
the transactions testified to by the witness Adry; and none of these
alleged aberrations or delusions was the same delusion under which it
is claimed the witness was laboring at the time of the trial, and at
the time of the transactions as to which he testified.    It is sometimes
said in the books that, if it appears that the person was once insane,
it is presumed that such insanity continued.    But it is well settled
that it is only habitual insanity, which has continued so long as to
raise a presumption that it is permanent, that is presumed to con-
tinue.    Lawson, Insan. Def. Crime, 861, § 82a; 1 Wharton, Cr. Law
§ 63; State v. Reddick, 7 Kan. 143; People v. Francis, 38 Cal. 183;

State v. Vann, 82 N. C. 631; State v. Spencer, 21 N. J. Law, 196. Even where irresponsible insanity for a considerable time is shown, the presumption that it will continue is destroyed by showing that the person has since been sane. See authorities above cited; also, State v. Brown, 1 Houst. Cr. Cas. 539, 556; State v. Johnson, 40 Conn. 136. These authorities also lay down the rule that temporary or spasmodic insanity is not presumed to continue, and evidence of the same, standing alone, is no evidence that the person is insane at a later period. See, also, Evans v. Hettich, 7 Wheat. 453, 470. The evidence offered not only failed to prove general insanity of a permanent type, but the temporary aberrations or delusions offered to be proved were not of the same type or character as the delusion claimed to exist in the mind of the witness at the time of the transactions to which the witness testified and at the time of trial, so as to raise a presumption that a particular delusion or type of delusions had become habitual.

12. The next question we will consider is the rejection by the court of the offers made by defendant to prove that ancestors and relatives of the witness Adry had been insane, for the purpose of proving that he was insane.

Defendant offered to prove by a number of depositions, and by the testimony of the father and mother of the witness, that several of his relatives and ancestors had been insane. As far as appears from the evidence returned to this court, there was, as before stated, nothing developed on the examination or cross-examination of the witness Adry which tended to prove that he was in any respect insane. Such evidence of insanity of ancestors and relatives can only be used to corroborate other evidence that the party himself is insane, and is irrelevant where there is no such other evidence. This is the rule even where the insanity is a direct, not a collateral, issue. State v. Cunningham, 72 N. C. 469; State v. Spencer, supra. Lawson, Insan. Def. Crime, 864, § 83. "They were all offers collateral or secondary to the proof of insanity, and were not admissible until direct evidence of the prisoner's insanity had been given. A court is not bound to hear evidence of the insanity of a man's relatives * * * until some evidence has been given that the prisoner himself has shown signs of his own insanity. Now, when these offers were made no evidence of his own insanity had been given. That he had at long in-

tervals before the week of the murder suffered spasms or fits of some kind, affecting him bodily, is all that had been proved, but no mental unsoundness had been shown." Laros v. Com., 84 Pa. St. 200, 209.

13. The next question is whether, if neither one of these classes of proof is alone sufficient, are not both together sufficient, without other evidence, to go to the jury as evidence on which they might find Adry insane? If evidence of insanity of some of his ancestors and relatives is not enough alone, and evidence of his prior temporary mental aberrations is not enough alone, are not both of these together sufficient to make his sanity at the time of the transactions testified to, and at the time of trial, a question for the jury? Whether or not the evidence would be sufficient if the question of his sanity or insanity was a direct issue in the case, and not merely a collateral issue, we need not decide. It being a collateral issue, we are of the opinion that the evidence was not sufficient.

There is a vast difference between trying the question of insanity as a direct issue in the case, and trying it as a collateral issue. A multiplicity of such collateral issues tends to prolong the trial and distract the jury, and they often cause the judge, as well as the jury, to lose sight of the main issues in the case. To prevent such multiplicity of collateral issues, and the evils resulting therefrom, has always been a strong policy of the law. It is the principal reason why the character of a witness cannot, as a general rule, be attacked by the evidence of other witnesses, except in showing his general reputation. It is often the case that the credit of the witness might be much more effectually destroyed by proving by other witnesses his specific acts and other specific facts in relation to him, but the multiplicity of issues thus raised would be intolerable. To prevent such a multiplicity of collateral issues, it has sometimes been held that evidence of the insanity of the witness can only be received on a challenge to his competency when he is offered, that the issue must be tried by the judge, and if the witness is found competent the evidence cannot be subsequently introduced before the jury to impeach his credibility. See Campbell v. State, 23 Ala. 44. This is the position taken by the state in this case, and seems to have been the position at first taken by the trial court, but that court subsequently receded from that position. We are of the opinion that the position is wholly untenable.

According to the modern doctrine, inmates of lunatic asylums, and

other persons conceded to be insane when offered as witnesses, may be held competent. Such persons are presumed to be incompetent as witnesses, and, if challenged for incompetency, it is the duty of the judge to examine into the question as a preliminary matter; and if he is of the opinion that the witness is so insane that he has not sufficient capacity to understand the obligations of an oath, to perceive what occurred, and remember and narrate what he perceived, then he should hold him incompetent. But if the judge is of the opinion that the witness has this capacity he may hold him competent, and leave the question of his credibility to the jury. Reg. v. Hill, 5 Cox, Cr. Cas. 259; District of Columbia v. Armes, 107 U. S. 519, 2 Sup. Ct. 840; People v. New York Hospital, 3 Abb. N. C. 229; Spittle v. Walton, L. R. 11 Eq. 420. "The general rule, therefore, is that a lunatic or a person affected with insanity is admissible as a witness if he have sufficient understanding to apprehend the obligation of an oath, and to be capable of giving a correct account of the matters which he has seen or heard in reference to the questions at issue; and whether he have that understanding is a question to be determined by the court, upon examination of the party himself, and any competent witnesses who can speak to the nature and extent of his insanity." District of Columbia v. Armes, supra. "The real question before us is whether * * * when, as a witness in this cause, he was subjected to a protracted and searching examination and cross-examination, without objection to his competency from any quarter, Joseph Mayo, Jr., possessed a sufficient share of understanding to appreciate the nature and obligation of an oath; to distinguish between right and wrong; to remember events of which he had been a witness; and to answer intelligently the questions propounded to him. If he then possessed that degree of intelligence, we think he was competent." Coleman v. Com., 25 Gratt. 865, 876. "He [the judge] then decides upon the competency of the witness, and if he admits him it is left to the jury to estimate the value of his testimony." Kendall v. May, 10 Allen, 63.

It does not follow that because an insane witness is held competent he must also be held credible. The jury are to take his testimony for what it is worth. But how are they to determine what it is worth, if they cannot be allowed to learn the nature, degree, and peculiarities of the insanity under which the witness is laboring? Only by the

examination and cross-examination of the witness, and the testimony of other witnesses, can they learn this. But these arguments and these authorities apply only when the insanity of the witness has been established, or is conceded.

The question before us is whether, under the circumstances, the evidence offered was sufficient to go to the jury to establish insanity. We must presume that Adry Hayward appeared perfectly sane, as there is nothing to show the contrary. Every one is presumed to be sane until the contrary appears, and we must hold in this case that the appearance of the witness, and his long and exhaustive examination and cross-examination, only added to this presumption. The defense did not offer to prove that the witness was ever habitually insane on any topic or subject which had any connection with the alleged illusion under which it is claimed he was laboring at the time to which his testimony related and at the time of the trial, or that he was ever habitually insane on any topic or subject whatever, or that he had any insanity of a permanent or habitual character at all. The only evidence offered was of prior, casual, and temporary illusions, no two of which appeared to belong to the same type. Such evidence, and the evidence of insanity of ancestors and relatives, was not sufficient, and the trial court was justified in refusing to receive the same until some less remote evidence was given of insanity of the witness at the time of trial, or at the times to which his testimony related. But no such evidence was offered. The fact that what he testified to was contradicted by other witnesses did not, as contended by appellant, prove that what he testified to was an insane delusion. To hold otherwise would be to hold that when a witness testifies falsely it is evidence that he is insane, and that every conflict of evidence tends to prove that one witness or the other is laboring under an insane delusion.

This disposes of all the questions in the case, and the order appealed from should be affirmed. It is so ordered.

START, C. J. I concur in the result, and with the reasons given for the decision of the court, with one exception.

The evidence of the witness Mrs. Hazleton, to the effect that Miss Ging stated to the witness some two hours before her murder that she had a business engagement that evening with the defendant, was

not admissible, in my opinion, on the ground that it tended to "characterize her subsequent acts and her departure on the fatal ride soon after she made the statement,"—that is, that it was a part of the res gestæ,—for the reason that her statement neither accompanied nor characterized any act relevant to the issue.    But it was relevant to the issue to show that she did meet the defendant, and evidence of her declarations of an intention and purpose to meet him was admissible as original evidence to prove that she did in fact intend to meet him,—a fact which tended directly to corroborate the previous testimony of Blixt that she did meet the defendant; for, if she had formed the previous purpose to meet him, the proof of such purpose rendered the evidence of Blixt that she did meet him reasonable and probable.    This evidence clearly falls within the rule that, when the question is whether a person did a certain act, his declarations, oral or written, made prior to and about the time he is alleged to have done an act, to the effect that he intended to do it, are admissible as original evidence, if made under circumstances precluding any suspicion or misrepresentation.    Mutual L. Ins. Co. v. Hillmon, 145 U. S. 285, 12 Sup. Ct. 909; Com. v. Trefethen, 157 Mass. 180, 31 N. E. 961. The cases cited are leading ones upon the question, and fully sustain the rule.    The admission of the evidence of Mrs. Hazleton in this case should be sustained upon the ground that it was original evidence tending to corroborate the evidence of Blixt.    To sustain it on the ground that the statement of the deceased was a part of the res gestæ is, in my judgment, to assign a wrong reason for a correct conclusion, which may lead to complications in future cases.