## Mincy, Appellant, *v.* Washington National Insurance Company.

286

Argued December 15, 1937.

Before KELLER, P. J., CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, JAMES and RHODES, JJ.

*Abraham T. Needleman,* for appellant.

*George H. Detweiler,* for appellee.

OPINION BY CUNNINGHAM, J., January 27, 1938:

Appellant was named as beneficiary in an industrial policy of life insurance, issued by the defendant insurance company on March 19, 1934, in the sum of $219 upon the life of Nona Mincy, his wife. Following her death on May 9, 1936, in the Philadelphia General Hospital from "hemorrhage secondary to aneurysm of the aorta," he brought suit for the face of the policy; the case was tried before a jury and resulted in a disagreement. On July 14, 1937, the court below, acting under the provisions of the Act of April 20, 1911, P.

L. 70, 12 PS § 684, entered judgment in favor of the defendant upon the whole record; this appeal is by the beneficiary from that judgment.

The motion for judgment in the company's favor was based upon the refusal by the trial judge of its request for binding instructions. The provision of the statute is that "it shall be the duty of the court unless it shall be of opinion that the case should be retried, . . . . . . to enter such judgment, if any, as under the law should have been entered upon [the] evidence at the time of trial." In other words, the test here is whether binding instructions should have been given for the defendant on the evidence admitted upon both sides at the trial.

Our consideration of this record has led us to the conclusion that defendant's point for binding instructions was properly declined. It follows that the court below erred in granting defendant's subsequent motion for judgment upon the whole record, because, under the pleadings and the evidence, the controlling facts were in dispute and the respective contentions of the parties depended upon oral evidence. The issues of fact thus arising were necessarily for a jury.

As the amount of the policy did not exceed $300, it was issued without a medical examination. A written application for the policy was offered in evidence at the trial but properly excluded because it had not been attached to the policy as required by Section 318 of "The Insurance Company Law" of May 17, 1921, P. L. 682, 40 PS § 441.

The policy itself contained a "sound health" clause reading: "If the insured is not alive or is not in sound health on the date hereof, . . . . . . or has, within two years before the date hereof, been attended by a physician for any serious disease or complaint, or before said date, has had any pulmonary disease, . . . . . . or disease of the heart, . . . . . . the liability of the company shall be limited to the return of premiums paid on the

policy, except in the case of fraud, in which case all premiums will be forfeited to the company."

On February 3, 1936, the policy lapsed for nonpayment of premiums and on the 26th of that month the arrears were paid by the insured and a written application was made by her for the reinstatement of the policy. It was upon a form entitled "Industrial Revival Application," signed by her in the presence of one of the company's field superintendents.

Upon this application medical examination was also waived. The paper was properly admitted in evidence at the instance of the company. The above referred to provision of "The Insurance Law" does not include an application for reinstatement or revival of a policy. A reinstated contract of insurance is not to be regarded as a new contract but as a waiver of a forfeiture, restoring the policy and making it as effective as if no forfeiture had occurred but reserving the right to the company to avoid the effect of the reinstatement by showing, if it can, that the same was procured by fraud: *Rothschild v. N. Y. Life Ins. Co.*, 106 Pa. Superior Ct. 554, 162 A. 463.

As a result of the payment of the arrearages of premiums and the making of the application for reinstatement the policy was officially revived on March 9, 1936. The controversy in the case centered around the circumstances under which the reinstatement was applied for and procured. The material paragraphs of that application read:

"To induce the company to revive the insurance ...... and as a consideration thereof, I agree on behalf of myself and any other person who shall have, or claim to have, any interest in any policy referred to in this application as follows:

"I have never had any of the following complaints or diseases, ...... disease of the heart, ...... habitual cough, ......, nor have I any physical ...... defect or infirmity of any kind.

"I have not been under the care of any physician within three years ...... I hereby declare that the statements recorded above and on the reverse side hereof are true and complete and I agree that any misrepresentation herein shall render the policy void and that the policy shall not be binding upon the company unless upon the date of official revival I shall be alive and in sound health."

The statement on the reverse side of the application reads: "The undersigned (applicant) hereby represents and declares that the person upon whose life the above described insurance was issued has not been sick or afflicted with any disease or injury, or consulted any doctor or surgeon, since this policy was lapsed, and agrees that no liability shall exist on the part of the company unless and until said company shall have approved this application at its home office in Chicago, Illinois, nor shall such liability exist unless, upon the date of such approval, the person upon whose life the above described insurance was issued shall be alive and in sound health."

Leon J. Fretz, a field superintendent of the company in whose presence the application was signed, certified as follows upon the application, "I personally interviewed the Life Proposed. I saw the above signature made. I am of the opinion that said Life is in good health. I recommend that this application be accepted."

When the case came to trial plaintiff established his prima facie case by placing in evidence the admitted averments of his statement of claim and producing the policy. The right of the company to contest its liability was not questioned. Its defense was that both the original contract and its revival had been procured by false and fraudulent representations upon the part of the insured, particularly as to the condition of her health at the time the policy was revived and with rela-

tion to medical treatment within the three years specified in the application for revival. It was averred in the affidavit of defense that the insured had received medical treatment during 1934 for "a heart condition and other involvement," and also during 1935; it was further averred she was afflicted with the disease which caused her death when the policy lapsed and at the time it was reinstated, and was not in sound health as represented by her in her application for revival.

There was presented, therefore, a case in which the insurer waived a medical examination before issuing the policy as well as before reviving it. The policy contained a "sound health" clause and, as above indicated, the application for reinstatement contained a similar provision. By reason of the existence in this case of an application in writing for reinstatement, neither the case of *Youngblood v. Prudential Ins. Co. of America,* 109 Pa. Superior Ct. 20, 165 A. 666, nor that of *Prudential Ins. Co. of America v. Kudoba et al.,* 323 Pa. 30, 186 A. 793, (in each of which the function of a "sound health" clause was considered) is controlling; in the former, there was neither a written application nor a medical examination, and in the latter, there was a medical examination.

In considering the extent of the burden resting upon the insurer in this case it is proper to bear in mind the amendment of July 19, 1935, P. L. 1319, 40 PS §511a (Supplement) adding a new section (411a) to "The Insurance Company Law" of 1921. It is therein provided, inter alia, that where the agent of an insurer, "recording the answers of the applicant where a medical examination is waived, ......" shall "declare the applicant a fit subject for insurance, ......" (as was done in the case at bar) the company shall "be estopped from setting up in defense of [an] action on the policy ...... that the insured was not in the condition of health required by the policy ...... at the time ......

[of] the recording of the answers of the applicant ...... unless the [policy] was procured by or through the fraud, deceit, or misrepresentation of or on behalf of, the insured."

As the case must be retried, it may not be amiss to remark that the company will have the burden of showing, by a fair preponderance of the evidence, not merely the fact of unsound health at the date of revival, but also that the applicant knew her health was unsound and fraudulently concealed that knowledge from the company.

When an applicant states he or she is in good health, the question of the good faith of the answer is for the jury, because it is quite possible that the applicant may believe the answer to be true although then suffering from some insidious disorder or latent disease: *Evans v. Penn Mutual L. Ins. Co.*, 322 Pa. 547, 554, 186 A. 133.

In this connection it may be stated there was no evidence that the insured had ever been advised by any physician that she had the aneurysm which caused her death.

One of the witnesses by whom the company sought to prove the insured knew she was not in sound health when she applied for reinstatement was Dr. Harry Miller, an interne at the hospital to which the insured was admitted on April 17, 1936. He testified from a hospital memorandum made by him the day following the patient's admission that she told him she had "developed hoarseness and a tickling sensation in her throat in September, 1935." The record, as read from by the witness, continued: "She developed a deep seated nonproductive cough. Attempts to expectorate caused her marked distress characterized by a choking sensation. The coughing spells have been infrequent until two weeks ago, April 4, 1936, when spells became more frequent," etc.

Manifestly, the above language was not used by the

insured; it is the witness's interpretation of her alleged statements to him. The only portion of the memorandum having any relation to the insured's condition of health on February 26, 1936, the date of her application, is her admission that she became hoarse, had a tickling in her throat, and developed a cough as early as September, 1935.

The record from which the witness read was not offered in evidence and counsel for the company says in his brief: "There was no effort in the present case to use hospital records as such." There is no documentary evidence of any kind in this record, bearing upon the truth or falsity of the insured's representations as contained in her application. Accepting the testimony of this witness at its face value, it is for a jury, and a jury alone, to say whether the insured's failure to disclose the symptoms referred to was fraudulent, or merely inadvertent. The terms, "sound health" or "good health" when used in an insurance application mean that the applicant has no "grave, important, or serious disease, and is free from any ailment that seriously affects the general soundness and healthfulness of the system." Whether the applicant honestly considered her hoarseness and cough comparatively minor ailments was clearly for the jury: *Adams v. Metropolitan L. Ins. Co.*, 322 Pa. 564, 186 A. 144, and cases there cited.

Another witness for the company was Dr. S. A. Savitz, who had charge of the insured at the hospital. After describing in detail the size of the aneurysm and its effect upon other organs, the witness expressed the opinion that it would take "between two and four years" for an aneurysm to become as large as the one with which the insured was suffering when admitted. This medical expert also testified the insured could not, in his opinion, have been in good health when she signed the application, and added his belief that "she must have noticed this condition in her chest," and its

effect upon her windpipe and lung, for a period of "at least two years." Upon cross-examination the doctor modified his statement to, "I am quite sure she suspected that she suffered with a grave illness." It was not within the province of the trial judge to determine what weight should be given to these opinions; that question was also for the jury.

Moreover, the testimony upon this branch of the case was not free from contradiction. The plaintiff testified that the insured's health was good when the application was signed; that she had never complained of illness; that she continued to do her usual housework up until about April 1, 1936, and was sent to the hospital by Dr. Griffith on April 17th. Mae Mincy, a niece of plaintiff, testified the insured had done "all the home work" and had not complained of any illness until a month after the revival of the policy. Irene Epps, who lived in the Mincy home from August, 1935, until April, 1936, testified to the same effect. We have already called attention to the certificate of the field superintendent relative to the apparent good health of the insured.

Upon the matter of consultation with, and treatment by, a physician within a specified period, we have a clearer issue, because an applicant necessarily knows whether the answers to such questions are true or false. Counsel for the company offered at the trial to prove by Dr. John Q. Griffith that he had treated the insured "on November 26, 1932, for violent action of the heart; that on April 25, 1933, (a date within the three year period) he treated her again for dyspnea, with a slight swelling of the feet; that on November 2, 1934, he prescribed for her for pain at her heart, and at her left shoulder blade; that on October 29, 1935, he prescribed for her for pain in the left shoulder and arm, and for a cold; [and] that on April 17, 1936, he gave her a paper admitting her to the Philadelphia General Hospital."

The trial judge sustained an objection on behalf of plaintiff to the admission of any evidence of consultations and treatments prior to the lapsing of the policy on February 3, 1936.

As shown by the above quotations from the application, it contained two representations relative to medical treatment: one, to the effect that the insured had not been sick or consulted any doctor "since [the] policy was lapsed," and the other, a positive statement that she had "not been under the care of any physician within three years." We are unable to see why proof of treatments by Dr. Griffith on April 25, 1933, and on November 2, 1934, was not admissible. The trial judge, in reviewing the record, evidently concluded this testimony should not have been excluded. In the course of the opinion supporting his judgment for the company he said: "If that offer had been allowed, there could have been no question as to the condition of her health and her treatment by a physician prior to the application for revival." If this means that the trial judge considered this offer as a part of the evidence upon which he rested the judgment, such inclusion of the admissible portion of the offer as a part of the evidence was error.

A motion for judgment upon the entire record must be disposed of upon the record as it existed "at the close of the trial." The court can neither eliminate evidence which may have been improperly admitted, nor insert offers of evidence which should have been admitted but were excluded; the remedy in either case is a new trial: *Ozanich v. Metro. Life Ins. Co.*, 119 Pa. Superior Ct. 52, 55, 180 A. 67. When the trial closed there was no evidence upon the record that the insured had consulted with or been treated by any physician within the three years preceding her application for reinstatement.

Other material facts were in dispute. The plaintiff and his witnesses, Mae Mincy and Irene Epps, all testi-

fied that the company's representative, Fretz, did not ask the insured the questions appearing upon the application for revival or any other questions relative to the condition of her health or previous medical treatment, nor did he afford the insured an opportunity to read the application. Their testimony was to the effect that all three of them were present in the room when the application was signed and that the insured was merely directed to sign the application on the lines indicated by a cross mark and did so, in ink, without reading the questions printed on the blank or having them read to her. It may be significant that her purported answers to the questions are written in pencil but the signatures of the insured were subscribed with pen and ink. This testimony was positively denied by Fretz, who insisted that no other persons were present when the application was signed and that he asked her all the questions upon the blank and wrote the answers as given to him by the insured.

When the record came before the court upon the company's motion for judgment it contained no documentary evidence as such (except the policy and application for revival) and the case was clearly within the principles of the rule reaffirmed in *Nanty-Glo Boro. v. American Surety Co.*, 309 Pa. 236, 163 A. 523, as applied by us in the case of *Dzsujko v. Eureka-Maryland Assurance Corp.*, 109 Pa. Superior Ct. 9, 165 A. 518.

Even if the hospital records from which the physicians called by the company read in delivering their testimony could be considered as documentary evidence, the disposition of this case should have been controlled by the principles thus announced by our Supreme Court in *Evans v. Penn Mutual Life Ins. Co.*, supra, at page 560: "If [the] falsity [of representations made by the insured] and the requisite bad faith affirmatively appear, (a) from competent and uncontradicted docu-

mentary evidence, such as hospital records, proofs of death, or admissions in the pleadings or (b) from the uncontradicted testimony of plaintiff's own witnesses, a verdict may be directed for the insurer. But whenever disputed questions of fact are presented by conflicting evidence, whether documentary or oral, or whenever the insurer's defense depends upon the testimony of its witnesses, even though such testimony is uncontradicted, the case must be submitted to the jury, subject to the trial court's power to award a new trial as often as in its sound discretion it may think the interests of justice require." See also *Osche v. New York Life Ins. Co.*, 324 Pa. 1, 187 A. 396.

The single assignment of error is to the entering of judgment for the defendant; for the reasons herein stated it must be sustained and a retrial directed.

Judgment reversed with a venire.