## Afflerbach v. Burns

*Lemuel B. Schofield* and *W. Bradley Ward,* for plaintiff.

*Robert T. McCracken,* for defendant.

MAWHINNEY, J., March 5, 1946.—This is an action in assumpsit to recover the sum of $25,000 with interest from January 26, 1943.

It is plaintiff's contention that the delivery of this money was a gift causa mortis to her by Judson C. Burns, the father of defendant. The case was tried by a judge and jury, and the jury disagreed. We are now considering defendant's motion for judgment upon the whole record.

Judson C. Burns, hereinafter referred to as Judson Burns, died on January 26, 1943, and during his lifetime was president and owner of a majority of the capital stock of Judson C. Burns, Inc., a corporation engaged in the sale and distribution of electric equipment, with its principal office located in Philadelphia. Plaintiff entered the employ of Judson Burns as a stenographer in 1912, left in 1913, returned in 1914 and continued to work for him continuously thereafter until the date of his death. The first wife of Judson Burns died in 1914, and after remarrying he was divorced from his second wife in April 1931. Robert Paul Burns, hereinafter referred to as Paul Burns, the defendant, was born of the first marriage, and no children were born of the second marriage. During plaintiff's employment by Judson Burns she did general secretarial and stenographic work and became secretary of Judson C. Burns, Inc. She devoted her entire time, energy and ability to the business, and assisted Judson Burns in activities in which he was personally interested, including the preparation of the text of a weekly radio broadcast of Sunday school lessons which Mr. Burns made for 14 years. He paid plaintiff's rent in every dwelling occupied by her for a period of 22 years preceding his death; he purchased and gave to plaintiff a house in Ventnor, N. J., including furnishings, having expended approximately $15,000 thereon; a house in Cynwyd representing the expenditure of $18,000 for real estate and furnishings;

nine automobiles at various times; in 1941 paid plaintiff's income tax amounting to approximately $1,000; purchased an annuity of $10,000 in the Phoenix Mutual Life Insurance Company; maintained charge accounts in various stores in Philadelphia; bought her furs and jewelry and in 1939 paid expenses incident to a surgical operation performed upon her mother. He gave her additional gifts from time to time and at Christmas 1942, gave her a $1,000 United States War Savings Bond. On January 19, 1943, seven days before his death, he gave her United States Treasury Bonds which cost $18,500, and on the following day a check for $6,500 which was cashed by her, and in his will provided for a legacy of $10,000. For many years prior to his death the relation between plaintiff and Judson Burns was very friendly. Many times they had lunch together at the office, had dinner together in the evening, and frequently went to a movie together in the evening. Numerous times at dinner in the evening Paul Burns, defendant, and his wife were their companions, and on a number of occasions Judson Burns and plaintiff were dinner guests of defendant and his wife at defendant's home. Plaintiff and Judson Burns discussed marriage on several occasions and on September 25, 1942, they obtained a license to marry in Kent County, Maryland. After a two-day waiting period the license was mailed to plaintiff but they were not married, and the reason given was that Mr. Burns' physical condition was becoming progressively worse and he did not feel able to return to Maryland for the ceremony. During his lifetime, Judson Burns traveled extensively and while on his trips wrote many letters over a period of years from points all over the world. A number of these letters were identified and offered in evidence, and excerpts therefrom were read to the jury. The letters indicated friendliness and love for plaintiff, and Mr. Burns indicated in some of them that he depended upon her spiritually when he was away from

her. Judson Burns suffered from a heart condition for sometime prior to his death and was under the care of a physician. It appeared that he knew of this condition for sometime prior to his death.

A controversy in this case has developed over the transfer by Judson Burns to Paul Burns, defendant, of $25,000 in cash on January 13, 1943, which plaintiff contends was money to be held for her benefit and to be paid to her after Judson Burns' death. On the morning of January 13, 1943, at the request of Judson Burns, plaintiff filled in with a typewriter a check upon the personal account of Judson Burns in Girard Trust Company to the order of Robert Paul Burns, defendant, in the sum of $25,000. At the time there was a balance of $73,423.78 in the account. She took the check in to the elder Burns' office and handed it to him in the presence of defendant. Judson Burns then tore up the check in the presence of defendant, handing the plaintiff another blank check on the same account and directed her to make it out in the same amount to cash. She returned to her office, filled out the check as directed and handed it to Judson Burns in defendant's presence. Judson Burns and defendant left the office and went to the Girard Trust Company where the elder Burns presented the check for payment and was paid by the bank $25,000 in cash in the form of 25 one thousand dollar bills, which he delivered to his son, defendant. Defendant placed the cash in his safe deposit box in the Girard Trust Company, and both father and son then returned to the office. While all three persons, plaintiff, defendant and Judson Burns, were in defendant's office plaintiff testified to the following conversation:

"Q. Now then, tell us exactly what was said by everybody in that conversation.

"A. Mr. Burns said to me, Now I want you to tell Paul just exactly which you just told me.

"Q. What you had just told Judson Burns?

"A. No, what Mr. Burns had just—yes, what I had just told Mr. Burns.

"Q. And did you then tell Paul Burns what you had just previously told his father?

"A. Yes.

"Q. What did you say to Paul Burns?

"A. I said to Paul, I said, Paul, your father just came in and told me that he had been to the bank and drawn $25,000.

"Q. And drawn—now keep your voice up so they can all hear you—and drawn $25,000?

"A. And that he had given it to Paul to put in his lock box to give to me if anything happened to Mr. Burns.

"MR. MCCRACKEN: To do what?

"MR. SCHOFIELD: To give it to me if anything happened to Mr. Burns.

"By MR. SCHOFIELD:

"Q. Go ahead.

"A. And I told your father that I didn't think that you would give it to me, because you didn't like me, and that you had even said that you would fire me as soon as Mr. Burns died. And Paul then said, I never said anything like that. And I said, Yes, you did, Paul, when Mr. Burns was operated on in 1930; and I said, You told me then that when Mr. Burns died there would be plenty of changes around here and I would be the first to go. And then Paul said, Oh, well, that was in 1930; that was before I was a Christian. I am a Christian now. And he said, I will do everything my father tells me to do; You needn't worry about me, that you will get your money.

"Q. What did Mr. Judson Burns say?

"A. Mr. Burns said then, You see, Grace, you are mistaken.

"Q. You see, Grace, you are mistaken?

"A. He said, You see, Grace, you are mistaken.

"Q. Was anything else said?

"A. No.

"Q. Then what happened?

"A. Then I walked away."

Assuming that any part of plaintiff's testimony should not have been admitted, it cannot be excluded in considering the motion now before the court. In Mincy v. Washington National Ins. Co., 130 Pa. Superior Ct. 285, the court said, p. 295:

"A motion for judgment upon the entire record must be disposed of upon the record as it existed 'at the close of the trial'. The court can neither eliminate evidence which may have been improperly admitted, nor insert offers of evidence which should have been admitted but were excluded; the remedy in either case is a new trial: . . ."

It however has been argued that plaintiff was incompetent as a witness under section 5(e) of the Act of May 23, 1887, P. L. 158, 28 PS §322. This section of the act provides:

"Nor, where any party to a thing or contract in action is dead, . . . and his right thereto or therein has passed, either by his own act or by the act of the law, to a party on the record, who represents his interest in the subject in controversy, shall any surviving or remaining party to such thing or contract, or any other person whose interest shall be adverse to the said right of such deceased . . . party, be a competent witness to any matter occurring before the death of said party. . . ."

No right of Judson Burns "to a thing or contract in action" has passed to a party on the record of this case. Paul Burns does not represent his father's interest. Both plaintiff and defendant admit that Judson Burns parted with the money in controversy absolutely and that he retained no claim or interest in it. The estate of decedent is not a party to the record nor does the estate claim any interest in the money. The respective interests of the parties are adverse to each other and

the prohibition of the above statute has no application. See Hamill v. Supreme Council of the Royal Arcanum, 152 Pa. 537, Solis v. Blank, 199 Pa. 600, and Gritz v. Gritz, 336 Pa. 161, citing Broadrick v. Broadrick, 25 Pa. Superior Ct. 225.

Plaintiff bases her right to recovery on the theory of the money passing to her as a donatio causa mortis. A gift causa mortis is a transfer made in contemplation or expectation of the donor's death. There must also be a delivery of the subject matter during the donor's lifetime to either the donee or some third person on his behalf, and there must be an acceptance by the donee. In the present case it was admitted by the pleadings that Judson Burns knew that his death was impending and that he was in apprehension thereof. It is admitted by both parties that there was a delivery absolutely by Judson Burns of the money in question to Paul Burns. Whether the delivery to Paul Burns was intended for the benefit and use of plaintiff or as a gift to the son outright, will be hereinafter fully discussed. The acceptance may be presumed as a matter of law where the gift is beneficial to the donee and imposes no burden upon the acceptor: Rynier Estate, 347 Pa. 471. The elements of a gift causa mortis were stated in Walsh's Appeal, 122 Pa. 177, at page 187:

"It may be defined as the voluntary transfer of a chattel completed by the delivery of possession . . . but when the gift is prompted by the belief of the donor that his death is impending, and is made as a provision for the donee, if death ensues, it is distinguished from the ordinary gift inter vivos and called donatio mortis causa. . . . There must be a purpose to give; this purpose must be expressed in words or signs; and it must be executed by the actual delivery of the thing given to the donee or someone for his use."

See also Elliot's Estate, 312 Pa. 493, and Rynier Estate, 347 Pa. 471, supra.

We are thus brought to the real issue of the case, namely, whether delivery of the $25,000 by Judson Burns to his son Paul Burns was intended as an outright gift to him, or whether delivery was to him as a gift in trust to be held until his father's death and then be turned over to plaintiff as beneficiary, thus completing by final delivery a gift causa mortis, and this issue is a question of fact to be determined from the testimony of the parties and from any and all corroborating and surrounding circumstances.

Defendant contends that the delivery in trust for plaintiff of the cash gift made by the elder Burns to his son was based upon testimony which was vague, incredible and uncorroborated, and that the facts should not have been submitted to the jury for it to pass upon, and that such evidence is inadequate to establish a trust. In Robinson v. Powell, 210 Pa. 232, the court approved the charge of the lower court which was in part (p. 233):

"It is a question of evidence, a question of fact to be decided by you under practically two rules of evidence: The first is that to constitute a trust here the evidence must be clear, precise, unequivocal and satisfactory. It must be such as convinces you that there was a trust for Annie Robinson beyond a reasonable doubt. The ordinary expression is, the evidence must be indubitable. Indubitable means without doubt.

"In the second place to support a verdict for the plaintiff before she can recover here, there must be evidence of this trust. That does not mean evidence of the deposit, but evidence that it was intended for Annie Robinson and not for Jane Powell, the evidence of two witnesses, or in the absence of two of one witness, with corroborating circumstances. In this case, as I understand it, there is only one witness who testifies to the amount of this money and that it was deposited in Jane's account—that is Miss Rollins. Then there must

be corroborating circumstances before you could find a verdict for the plaintiff, even if you believed her story absolutely."

In Gribbel v. Gribbel, 341 Pa. 11, the Supreme Court affirmed the decree on the opinion of the lower court wherein it was said (pp. 15 and 16):

"In the evolution of our economic order wealth has been increasingly represented by personal property rather than by real property. The growth of our common law was founded upon an agricultural society in which the major part of the wealth was represented by the latter type and about which most of the legal safeguards were naturally cast, notably the statute of frauds. An anomalous and perhaps dangerous situation now results. It is particularly true of the parol declaration of trust and the facility by which it may be established. A gift requires delivery, which in itself is a safeguard. It takes little, however, to change a parol promise to make a gift in the future or to create a trust, or more particularly to create a trust the enjoyment of which is postponed into a declaration of present creation. Prudently our courts have required that proof of a parol declaration be clear, precise and indubitable, definite and convincing, free from ambiguity and subject to but one interpretation. If these requirements are to be disregarded as mere verbiage the consequences are grave but apparent."

We are thus called upon to decide whether the delivery of the $25,000 in question was a gift in trust to Paul Burns, and to sustain the trust the evidence must be as stated by our Supreme Court, clear, precise and indubitable, definite and convincing and subject to but one interpretation. In this case we have the conversation set out above at which time Judson Burns, his son, the defendant, and plaintiff were present. This conversation, testified to by plaintiff, if believed by the jury and taken in its entirety, is evidence that the delivery of the money to Paul Burns was in trust for

plaintiff to be delivered to her on Judson Burns' death. In addition to this testimony the circumstances surrounding the gift are all part of the corroborative evidence to be submitted to the jury. The evidence reveals that Judson Burns drew a check to the order of his son, Paul Burns, for $25,000. Significantly, he tore it up and had another check drawn to the order of cash. This is some evidence to be considered by the jury as to whether a gift was intended outright to Paul Burns. Later Judson Burns accompanied defendant to the bank where the check was presented for payment and 25 one thousand dollar bills were delivered to Judson Burns, who handed the money to defendant, who immediately placed the money in a safe deposit box. The jury is entitled to consider this evidence and decide if it is consistent with a gift to Paul Burns. There is evidence of the large estate of Judson Burns left by will to Paul Burns, and there is evidence Judson Burns knew that his death was imminent. These facts are to be considered in determining whether in view of his impending death Judson Burns made an additional transfer of the $25,000 in question to Paul Burns absolutely or for the benefit of plaintiff.

Another fact to note is that plaintiff in narrating the conversation which was participated in by Judson Burns, defendant and herself on January 13, 1943, stated that the elder Burns told her that defendant had placed $25,000 in cash in his safe deposit box. There was nothing in the affidavit of defense to disclose this information and defendant had not yet testified on the stand. Defendant has denied that this conversation ever took place, but plaintiff obtained this information somewhere, it is material as to whether plaintiff was telling the truth, and it is evidence for the jury to consider in deciding the whole case.

The only other question to be considered is whether offers of proof made by plaintiff and excluded would, if admitted, have strengthened plaintiff's case. The ad-

missibility of the excluded evidence is considered at length infra, but its effect must be considered here. Plaintiff by her own testimony and by another witness offered to prove statements or declarations made by Judson Burns to them prior to the delivery of the money to Paul Burns. These declarations were intended to show the intentions of Judson Burns concerning the drawing and cashing of the $25,000 check. We have decided infra, that this testimony should have been admitted. This additional testimony together with the testimony admitted in evidence we believe is sufficient to submit to the jury which must by law determine the facts in the case. We have reviewed carefully the cases cited by defendant in his brief, but considering the record as it now stands and having decided plaintiff was entitled to have in the record the evidence excluded at the trial, the only alternative is to overrule defendant's motion and grant a new trial.

Plaintiff contends defendant's motion for judgment on the whole record should fail for the additional reason that certain testimony offered by plaintiff was refused by the court. Only two of these offers require our consideration. Plaintiff offered to testify concerning statements made by Judson Burns about his intentions with respect to drawing the check for the $25,000, and more specifically the following question addressed to her:

"Q. What had Mr. Burns said to you as to what he intended to do with that check at the time he told you to draw it, that morning?"

An offer of testimony was also made by a witness for plaintiff, Howard C. Blensinger, concerning statements made by Judson Burns relating to his intentions to give money gifts including the gift in question to plaintiff. Objection to all of the above testimony was sustained by the court. It must now be determined whether any of the above testimony should have been allowed. In 1 Wigmore on Evidence (3d ed.) Section 102, it is stated:

"The presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done. A plan is not always carried out, but it is more or less likely to be carried out. The existence of the plan is always used in daily life as the basis of an inference to the act planned. There is no question about the relevancy in general of such evidence: . . . ."

In Section 103 the author states:

"When it is sought to evidence a design or plan by expressions of the person alleged to have entertained it, the question immediately arises whether the Hearsay rule applies and whether such expressions may enter under some exception to it . . . ."

" . . . the importance of Design, plan or intention is chiefly its evidentiary aspect, as looking forward and tending to prove the act in question; while the important aspect of Intent is chiefly not an evidentiary one at all, but one of substantive law, as a state of mind accompanying the act in question and necessary to its legal effect."

In volume 6 of the same work, Section 1725, the following appears:

"It has already been seen . . . that the existence of a *design* or *plan to do* a specific act is relevant to show that the act was probably done as planned. The design or plan, being thus in its turn a fact to be proved, may be evidenced circumstantially by the person's conduct . . . But, as a condition of mind, the plan or design may also, it is clear, be evidenced under the present Exception by the *person's own statements* as to its existence.

"The only limitations as to the use of such statements (assuming the fact of the design to be relevant) are those suggested by the general principle of this Exception (ante, §1714), namely the statements must be of a *present existing state of mind*, and must appear

to have been made in a natural manner and not under circumstances of suspicion. . . .

"The use of such statements of design or plan is illustrated in a variety of precedents. The typical situation, it must be noted, involves (1) the doing of an act which is in some way part of the issue or relevant thereto, (2) the existence of a design or plan to do this act, as evidence (*ante*, §102) of the probable doing of the act, and (3) the hearsay use, under the present exception, of the person's statements of this design or plan."

It may well be that had plaintiff and her witness been permitted to testify to statements of Judson Burns just prior to and at the time of directing the writing of the check for $25,000, evidence of his intent to deliver the money to his son in trust for plaintiff would have appeared. If such testimony would have revealed a plan or present intention to deliver the money in question to defendant as a gift for plaintiff, it could have been received as a declaration, admissible because of necessity and an exception to the hearsay rule. In Commonwealth v. Marshall, 287 Pa. 512, the court found that in a murder trial, where the place of the killing is shown by independent evidence, declarations of the deceased to a third person on the day of the murder that she was going to meet the prisoner that evening at such place was admissible. The court stated (p. 521):

"We are of opinion that the conversation was admissible, in connection with other evidence in the case, to show the intention of the deceased to meet defendant that evening: Ickes v. Ickes, 237 Pa. 582, 592-3 . . . but proof of intention may be received for more than mere purpose of corroboration. In a case cited by us in Ickes v. Ickes, supra (at pages 593-4), it was held that 'Evidence of what a person's intentions were is relevant circumstantially to show that he afterward carried out his designs'; further, that such intentions could be proved by the person's declarations. There,

as here, the person in question was the victim of a homicide; and the declarations were offered to show the deceased's 'intention and purpose to meet the defendant on the day of the murder.' "

The court further stated (p. 522):

"Intention, viewed as a state of mind, is a fact, and the commonest way for such a fact to evince itself is through spoken or written declarations. It is, therefore, because of the impossibility, in many cases, of proving intention apart from personal declarations, that they are admitted. The true basis of their admission, then, is necessity, because of which an exception to the hearsay rule is recognized, rather than that they are part of the res gestae: Ickes v. Ickes, 237 Pa. 582, 593, 594; Com. v. Trefethen, 157 Mass. 180, 31 N. E. 961; Mut. Life Ins. Co. v. Hillmon, 145 U. S. 285, 295; State v. Hayward, 62 Minn. 474, 65 N. W. 63, 70; Wigmore, supra, sections 1725, 1726. On this basis it is immaterial whether or not the declaration accompanied and was part of a relevant act: State v. Hayward, supra; Wigmore, supra.

"The circumstances in regard to the declarations offered in State v. Hayward, just cited, were very similar to those here involved, and therefore the following language of the concurring opinion of Start, C. J., is particularly appropriate to the present case. He said (65 N. W. at p. 70), 'The evidence to the effect that [deceased] stated, . . . some two hours before her murder, that she had a business engagement that evening with defendant, was not admissible, . . . on the ground that . . . it was part of the res gestae,— for the reason that her statement neither accompanied nor characterized any act relevant to the issue; but it was relevant to the issue to show that she did meet the defendant, and evidence of her declaration of an intention and purpose to meet him was admissible as original evidence to prove that she did in fact intend to meet him. . . .' "

In the case of Ickes v. Ickes, 237 Pa. 582, cited supra, an action was brought by a wife against her husband's father for alienation of her husband's affections. Certain declarations made by the husband that he left because of the wife's unfaithfulness rather than because of the father's influence were held admissible. The court stated (p. 591) :

"When the court determines in any case that a man's state of mind, or the reason why he did a certain act, is a relevant principal fact to be ascertained, that is the particular thing under immediate investigation, and what he may have said concerning it is usually the best and only evidence that can be obtained on the subject; but the proofs must always be restricted to declarations indicating the state of mind at the time of their utterance. When evidence of this character is produced, sufficient to show a then present intention, or state of mind, it may be assumed to have continued and formed the motive which controlled the doing of a subsequent act following closely thereafter, if under all the surrounding circumstances one would naturally associate the two together; and it is for the jury to draw the conclusion."

In Cockcroft v. Metropolitan Life Ins. Co., 133 Pa. Superior Ct. 598, the court again stated the applicable rule (p. 600) :

"The proposition has been accepted in this state, that extra-judicial declarations made by a person who cannot be called as a witness, and relied upon solely to show an existing intention or state of mind of the declarant, are admissible in evidence as an exception to the rule of hearsay, provided such declarations appear to have been made in a natural manner, not under circumstances of suspicion, and that they are material and relevant to the issue involved: Wigmore on Evidence (2d Ed.) Vol. 3, sec. 1725; *Com. v. Trefethen,* 157 Mass. 180; *Ickes v. Ickes,* 237 Pa. 582, 85 A. 885."

In Wise's Estate, 182 Pa. 168, a widow claimed certain securities had been given to her by her husband shortly before his death. Three witnesses testified to decedent's repeated declaration about the time of the gift, that all his property was to be his wife's. The court in commenting on this evidence stated (p. 171):

"These declarations would not of course establish a gift, but they are confirmatory of the intent with which the actual delivery of the securities testified to by the other witnesses was made."

See also Rhodes v. Childs, 64 Pa. 18, Merigan v. McGonigle, 205 Pa. 321, Leitch v. Diamond Natl. Bank of Pittsburgh, 234 Pa. 557, Campbell's Estate, 274 Pa. 546, Purcell v. Metropolitan Life Ins. Co., 336 Pa. 588, and Wenz's Estate, 345 Pa. 393.

Had the testimony concerning Judson Burns' intention concerning the writing of the check for $25,000 and delivery to his son been admitted as we now believe it should, plaintiff's case would have been materially strengthened. After a careful review of the entire record it is believed substantial justice requires a retrial of the case. In Phillips v. American Stores Co., 342 Pa. 33, the court stated (p. 36):

"The mere fact that the jury disagreed would not furnish any basis for depriving a party of the right to have justice done him. If a court, after disagreement of the jury, was of the opinion that justice required a new trial before the legal question was disposed of, it was certainly his duty to refuse to enter a final judgment. Our inquiry therefore is whether the court abused its discretion in refusing judgment on the whole record for the reason that he believed substantial justice required a retrial of the case."

The court further stated:

"The situation presented to us is therefore the same as if the court had granted a new trial after a verdict. On an appeal from an order such as the one here complained of, we never reverse unless a palpable abuse

of discretion on the part of the trial judge is disclosed or unless an erroneous rule of law, which in the circumstances necessarily controls the outcome of a case, is certified by the trial judge as the sole reason for his action: . . ."

Wherefore, defendant's motion for judgment on the whole record is overruled, and because the jury failed to agree on a verdict, a new trial is granted.